UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————

ALEEM MUHAMMAD,

               Plaintiff,

        - against -

THE PORT AUTHORITY OF NEW
YORK AND NEW JERSEY, ET AL.,

               Defendants.

———————————————————————

**23-cv-9908 (JGK)**

<u>Memorandum</u>
<u>Opinion and Order</u>

**John G. Koeltl, District Judge:**

The plaintiff, Aleem Muhammad, alleges that he was seriously injured by a police officer who arrested him for fare evasion at the World Trade Center Port Authority Trans-Hudson ("PATH") station. Muhammad brings various federal-law and state-law claims against the arresting officer, Daniel Lepore; the Port Authority of New York and New Jersey (the "Port Authority"); and the Port Authority Police Department (collectively, the "defendants"). The defendants move pursuant to Federal Rule of Civil Procedure 56 for summary judgment dismissing all of Muhammad's claims. For the following reasons, the defendants' motion is **granted in part** and **denied in part.**

## I.

The following facts are based on the parties' Local Civil Rule 56.1 statements and supporting papers and are undisputed unless otherwise noted.

**A.**

On January 31, 2023, Muhammad was traveling around New York City with his friend Charles Porter. Defs.' Local Rule 56.1 Statement ("56.1 Statement") ¶¶ 8–10, ECF No. 40. Muhammad and Porter started their journey in New Jersey and took the PATH train to Manhattan. Id. ¶ 9. They then went to Brooklyn before traveling to the Fulton Street subway station in Manhattan. Id. ¶¶ 9–10. From there, they walked to the PATH station at the World Trade Center. Id. ¶ 10. Muhammad and Porter had not paid any of their fares that day. Id. ¶ 12.

The PATH station at the World Trade Center has a series of fare-controlled turnstiles. Id. ¶ 14. Muhammad and Porter observed several law-enforcement officers at the station, including Lepore. Id. ¶ 15. They attempted to bypass a turnstile without paying but were caught by Lepore. Id. ¶ 18. According to the defendants, Lepore told Muhammad and Porter that they could not get through without paying the fare and that they should inform him if they required help. Id. ¶ 19. Muhammad and Porter allegedly ignored Lepore. Id. Muhammad, by contrast, alleges that he did not ignore Lepore, but instead asked for permission to enter without paying. Pl.'s Local Rule 56.1 Counterstatement ("56.1 Counterstatement") 2, ¶ 19, ECF No. 46. Lepore said Muhammad and Porter would have to pay. Id.

Muhammad and Porter then walked to the far side of the fare zone and attempted to walk through an accessible turnstile, again without paying the fare. 56.1 Statement ¶ 20. The defendants contend that Lepore approached

Muhammad and Porter a second time to ask if they needed help and was again ignored. Id. ¶ 21. Muhammad instead alleges that he told Lepore that he and Porter lacked money to pay the fare and that Lepore again told the two that they would have to pay. 56.1 Counterstatement 2, ¶ 22.

Muhammad and Porter eventually succeeded in entering through the accessible turnstile without paying the fare by "piggybacking" on someone who had paid the fare.[1] 56.1 Statement ¶¶ 23, 25. According to the defendants, Lepore approached Muhammad and Porter intending to serve them with a summons for criminal trespass. Id. ¶ 26. Muhammad denies that Lepore made any attempt to serve a summons. 56.1 Counterstatement 3, ¶ 26. The parties also dispute what was said when Lepore approached Muhammad and Porter. Compare 56.1 Statement ¶¶ 28–29, with 56.1 Counterstatement 3, ¶ 29.

The parties' allegations about what happened next differ sharply.

The defendants contend that Muhammad abruptly moved his hands when Lepore got closer and that Muhammad attempted to walk away. 56.1 Statement ¶ 30; see also Decl. of Cheryl Alterman Supp. Mot. Summ. J. ("Alterman Decl."), Ex. I ("Defs.' Video"), 0:24–0:29, ECF No. 39–9. When Lepore tried to grab Muhammad, Muhammad flailed his hands and struck Lepore's left forearm. 56.1 Statement ¶ 31; see also Defs.' Video, 0:24–0:29. Lepore then told Muhammad that he was under arrest and attempted to place him in handcuffs, but Muhammad "contorted his body and pulled away." 56.1 Statement

---

[1] Unless otherwise noted, this Memorandum Opinion and Order omits all internal alterations, citations, footnotes, and quotation marks in quoted text.

¶ 32; see also Alterman Decl., Ex. G ("Lepore Dep. Tr."), 38:2–39:21, ECF No. 39–7; Defs.' Video, 0:24–0:29. According to the defendants, Muhammad knew he was under arrest but still refused to put his hands behind his back or to comply with Lepore's instructions. 56.1 Statement ¶ 33; Lepore Dep. Tr. 43:24–44:7.

Lepore then used a "double-hook 'bear hug takedown'" to bring Muhammad to the ground and place him in handcuffs. Lepore Dep. Tr. 39:7–15; 43:13–19; Defs.' Video 0:28–0:34. The double-hook bear hug takedown is a technique that involves "wrapping the arms around a subject and bringing the person to the ground without falling on top of them." 56.1 Counterstatement 4, ¶ 35. The defendants argue that Lepore used this technique to "gain[] control by using only a reasonable amount of force." Id. ¶ 36; see also Lepore Dep. Tr. 47:19–20, 80:21–81:4; Defs.' Video, 0:28–0:34.

Muhammad, by contrast, alleges that Lepore first tried to grab him without stating that he was under arrest. 56.1 Counterstatement 3, ¶ 27; see also Alterman Decl., Ex. F ("Muhammad Dep. Tr."), 99:1–16, ECF No. 39–6. Muhammad denies having waved his arms at Lepore and instead contends that he raised his hands to communicate that he did not want to be touched. 56.1 Counterstatement 6, ¶ 9; see also Muhammad Dep. Tr. 100:3–101:6; Decl. of Michael J. Kesselman Opp'n Mot. Summ. J. ("Kesselman Decl."), Ex. 2 ("Pl.'s Video"), 1:10–1:15, ECF No. 45–2. Muhammad further denies having contorted his body or otherwise resisting when Lepore tried to arrest him. 56.1 Counterstatement 6, ¶ 10; see also Muhammad Dep. Tr. 106:8–15. Muhammad asserts

4

that Lepore then lifted him into the air and threw him violently onto the floor. 56.1 Counterstatement 6, ¶ 11; see also Pl.'s Video, 1:15–1:20; Muhammad Dep. Tr. 103:18–104:6. Muhammad further contends that Lepore tried, but failed, to execute a double-hook bear hug maneuver; instead of releasing his grip and landing beside Muhammad, Lepore continued to grasp his hands together and landed on top of Muhammad. 56.1 Counterstatement 7, ¶¶ 13–14; see also Pl.'s Video, 1:15–1:20.

Muhammad testified that he immediately felt pain on his right side. 56.1 Counterstatement 7, ¶ 15; see also Muhammad Dep. Tr. 110:10–111:11, 111:20–112:8. He subsequently went to the emergency room, where doctors told him that he had broken his hip and would need surgery. 56.1 Counterstatement 7, ¶ 16; see also Muhammad Dep. Tr. 120:21–121:21; 123:17–125:12.

Muhammad was ultimately charged with Criminal Trespass in the Third Degree in violation of N.Y. Penal Law § 140.10 and Resisting Arrest in violation of N.Y. Penal Law § 205.30. 56.1 Statement ¶ 42.

### B.

Muhammad filed a complaint in New York State Supreme Court against the defendants on September 2, 2023, and then amended his complaint on September 22, 2023. See Alterman Decl., Exs. A & B. The Port Authority removed the action to this Court on November 9, 2023. ECF No. 1. The Port Authority

answered the amended complaint on November 16, 2023. ECF No. 4. Lepore answered on January 10, 2024. ECF No. 12.

Muhammad's amended complaint alleges claims for excessive force in violation of the Fourth Amendment to the United States Constitution, as well as New York state-law claims for assault and battery, negligent hiring and retention, false arrest, false imprisonment, intentional and negligent infliction of emotional distress, and malicious prosecution. The defendants now move for summary judgment dismissing all of Muhammad's claims. ECF No. 38.

## II.

The standard for granting summary judgment is well established. The Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." Gallo v. Prudential Residential Servs., L.P., 22 F.3d 1219, 1224 (2d Cir. 1994). The moving party bears the initial burden of "informing the district court of the basis for its motion" and identifying the matter or matters that "it believes demonstrate the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323. The substantive law governing the case will

identify those facts which are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). But "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Scott v. Harris, 550 U.S. 372, 380 (2007). "Incontrovertible evidence relied on by the moving party, such as a relevant videotape whose accuracy is unchallenged, should be credited by the court on such a motion if it so utterly discredits the opposing party's version that no reasonable juror could fail to believe the version advanced by the moving party." Zellner v. Summerlin, 494 F.3d 344, 371 (2d Cir. 2007).[2]

Summary judgment is improper if there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party. See Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 37 (2d Cir. 1994). If the moving party meets its burden, the nonmoving party must

---

[2] Although Zellner involved a motion for judgment as a matter of law, it is well-established that "the standard for granting summary judgment mirrors the standard for judgment as a matter of law." Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 150 (2000).

produce evidence in the record and "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible." Ying Jing Gan v. City of N.Y., 996 F.2d 522, 532 (2d Cir. 1993); see also Scotto v. Almenas, 143 F.3d 105, 114–15 (2d Cir. 1998).

### III.

The defendants move for summary judgment on all of Muhammad's claims: his federal excessive-force claim and his state-law claims for assault and battery, negligent hiring and retention, false arrest, false imprisonment, intentional and negligent infliction of emotional distress, and malicious prosecution.

Muhammad concedes that summary judgment dismissing his claims for negligent hiring and retention, false arrest, false imprisonment, intentional and negligent infliction of emotional distress, and malicious prosecution is appropriate. He also concedes that the Port Authority Police Department is not a suable entity. And he concedes that he cannot establish municipal liability for his Fourth Amendment claim against the Port Authority under Monell v. Department of Social Services, 436 U.S. 658 (1978). Mem. Law Opp'n Mot. Summ. J. ("Opp'n") 2, ECF No. 47.

Muhammad argues, however, that genuine disputes of material fact remain with respect to his federal excessive-force claim against Lepore, his assault-and-battery claim against Lepore and the Port Authority, and his request for punitive damages.

8

## A.

### 1.

The defendants first move for summary judgment on Muhammad's claim under 42 U.S.C. § 1983 that Lepore used excessive force in violation of the Fourth Amendment. "A police officer violates the Fourth Amendment if the amount of force he uses in effectuating an arrest is 'objectively unreasonable' in light of the facts and circumstances confronting the officer." Lennox v. Miller, 968 F.3d 150, 155 (2d Cir. 2020) (quoting Graham v. Connor, 490 U.S. 386, 397 (1989)). "A determination of whether the force was reasonable 'requires careful attention to the facts and circumstances of each particular case, including [1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officer or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight.'" Id. (quoting Graham, 490 U.S. at 396). "A court's role in considering [a motion for summary judgment on] excessive force claims is to determine whether a jury, instructed as to the relevant factors, could reasonably find that the force used was excessive." Brown v. City of New York, 798 F.3d 94, 103 (2d Cir. 2015).

Muhammad argues that the first Graham factor incontrovertibly favors him and that there are, at a minimum, genuine disputes of material fact regarding the second and third Graham factors.

The first factor—the severity of the crime at issue—favors Muhammad. Lepore initially stopped Muhammad and Porter for fare evasion. After he was arrested, Muhammad was charged with third-degree criminal trespass and

9

resisting arrest. These offenses are misdemeanors under New York law. See N.Y. Penal Law § 140.10 ("Criminal trespass in the third degree is a class B misdemeanor."); N.Y. Penal Law § 205.30 ("Resisting arrest is a class A misdemeanor."). Misdemeanors are non-serious crimes for purposes of the Graham analysis. See Ketcham v. City of Mount Vernon, 992 F.3d 144, 150 (2d Cir. 2021) (finding that the first Graham factor favored the plaintiff because "the offense was a misdemeanor"). The defendants do not contest this factor.

The second factor—whether Muhammad posed an immediate threat at the time Lepore used force—is the subject of a genuine factual dispute. Muhammad and Porter were walking through the station before Lepore approached them. Pl.'s Video, 0:50–1:10. Porter approached Lepore and began speaking, and the two walked side-by-side while Muhammad continued to walk ahead without engaging. Id. 0:58–1:05. Lepore pushed Porter away with one arm while Porter appeared to be speaking. Id. 1:07–1:08. Lepore then tried to grab Muhammad. Id. 1:10–1:11. Muhammad contends that he raised his arms in "a defensive posture to defend himself" and backed away from Lepore. Opp'n 7; see also Pl.'s Video, 1:08–1:12. The defendants, by contrast, argue that Muhammad "threatened the safety of Officer Lepore by striking his left forearm, physically pulling away from him, and refusing multiple lawful commands." Reply Mem. Law Supp. Mot. Summ. J. ("Reply") 3, ECF No. 48; see also Lepore Dep. Tr. 38:2–39:21; Def.'s Video, 0:24–0:29.

That Muhammad failed to comply with Lepore's lawful commands "alone does not create a threat to safety." Harris, 2023 WL 2051171, at *3; see also

Brown, 798 F.3d at 102 ("At most, [the plaintiff's] 'resistance' was a refusal to permit the easy application of handcuffs by placing her hands behind her back," and she "posed no threat whatever to the safety of the officer or others."). As for whether Muhammad physically struck Lepore, the parties dispute what happened, and the evidence in the record is unclear. Although both Muhammad and the defendants cite the surveillance video of the incident to support their accounts, the video does not conclusively show whether Muhammad struck Lepore or instead merely abruptly raised his hands to withdraw. And the parties point to contradictory deposition testimony. Lepore testified that Muhammad flailed and struck Lepore's left forearm. Lepore Dep. Tr. 41:18–42:17. Lepore also testified that Muhammad struck him with a "[r]easonable amount of force," which hurt "[a] little bit." Id. 42:12, 42:16–17. Muhammad, for his part, testified that he never flailed his arms and that he was not sure whether he "swat[ted]" at Lepore's arms while raising his arms. Muhammad Dep. Tr. 101:7–15. Despite the defendants' plausible contention that Muhammad swatted Lepore's arm away, a reasonable jury could, on this record, find that Muhammad posed no threat when Lepore brought him to the ground.

The third factor—whether Muhammad was actively resisting arrest or attempting to evade arrest by flight—is also subject to a genuine dispute. "For purposes of the excessive force analysis, resisting arrest can include passive resistance or non-compliance." Harris, 2023 WL 2051171, at *3; see also Amnesty Am. v. Town of W. Hartford, 361 F.3d 113, 123 (2d Cir. 2004) (holding that law-enforcement officer violated the Fourth Amendment by throwing the

11

plaintiff to the ground in response to "resistance to arrest [that] was purely passive"). The defendants contend that at the time Lepore threw Muhammad to the ground, Muhammad was "refus[ing] to comply" and "instead contorting his body to prevent" his arrest. Mem. Law Supp. Mot. Summ. J. ("Mot.") 3, ECF No. 41. Lepore also testified that Muhammad "contorted his body" and "tightened up so" that Lepore could not handcuff him. Lepore Dep. Tr. 39:5–6. Muhammad, by contrast, testified that he did not resist or "try to maneuver" his hands while Lepore was trying to arrest him. Muhammad Dep. Tr. 106:8–16. The parties again cite the surveillance footage to support their accounts, but it is unclear from the video whether Muhammad was resisting when Lepore threw him to the ground. See Pl.'s Video, 1:13–1:18. A reasonable jury could conclude, despite the defendants' insistence to the contrary, that Muhammad was not resisting arrest at the time Lepore threw him to the ground.

The defendants resist this conclusion by pointing to the report of their expert, John Monaghan, who concluded that Lepore appropriately executed the double-hook bear hug takedown under the circumstances. Reply 6–8. According to Monaghan, "Muhammad responded by smacking Officer Lepore's hands away," at which point "the officer's uniform presence and verbal persuasion efforts had failed, and it became an arrest situation." Alterman Decl., Ex. H, at 10, ECF No. 39–8. But Monaghan's report does not resolve any of the disputed factual questions. To the contrary, his conclusion rests on several assumptions that Muhammad disputes with his own record evidence, such as whether he smacked Lepore's left arm and whether he was resisting arrest at

the time Lepore used the takedown maneuver. A reasonable jury could consider the evidence and reach a different conclusion. See Giles v. Rhodes, 171 F. Supp. 2d 220, 226–27 (S.D.N.Y. 2001) ("[I]t is well established that a lay jury can refuse to credit an expert's opinion, even if another expert was not called on to rebut it.").

Moreover, while Monaghan opines that the force used was a reasonable application of the double-hook bear hug maneuver, the plaintiff points out that the instructional materials for Port Authority Police Officers state that when using the maneuver, "it is very important" that the officer "release[s] [his] hands as [he] take[s] the threat down to avoid landing on the threat." Kesselman Decl., Ex. 1, at PA 0099 at ¶ H 4, ECF No. 45–1. In this case, however, Lapore landed squarely on top of Muhammad with the full force of Lepore's body. Defs.' Video, 00:33. Monaghan makes no mention of this fact in his report.

Interpreting the evidence in the light most favorable to Muhammad, a reasonable jury could conclude, despite Muhammad's failure to comply with Lepore's instructions, that he posed no threat and that Lepore's use of force—throwing Muhammad to the ground with sufficient force to break his hip—was objectively unreasonable under the circumstances. "An aggregate assessment of all three relevant Graham factors" thus points "toward a determination of excessive force and, at a minimum, to preclude a ruling against the victim on a motion for summary judgment." Brown, 798 F.3d at 102.

**2.**

The defendants argue that even if Lepore used excessive force against Muhammad, Lepore would nevertheless be protected by qualified immunity. "The doctrine of qualified immunity shields police officers acting in their official capacity from suits for damages unless their actions violate clearly-established rights of which an objectively reasonable official would have known." McKinney v. City of Middletown, 49 F.4th 730, 738 (2d Cir. 2022). "Officials operating under color of state law" are entitled to qualified immunity at the summary-judgment stage "when they can establish that either (1) a constitutional right was not violated or (2) the right was not clearly established at the time of the violation." Raspardo v. Carlone, 770 F.3d 97, 113 (2d Cir. 2014). "Courts are cautioned not to define clearly established law at a high level of generality, and police officers are entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue." Lennox, 968 F.3d at 156–57. "This is not to say that there must be a case directly on point for a right to be clearly established, but existing precedent must have placed the statutory or constitutional question beyond debate." Id. "To determine qualified immunity on a motion for summary judgment, the facts are construed, and all reasonable inferences are drawn, in favor of" the nonmovant. Harris, 2023 WL 2051171, at *6.

Drawing all inferences in Muhammad's favor, the relevant facts are: Muhammad was walking through the station after failing to pay the fare; he ignored Lepore's commands and continued walking; when Lepore first

14

attempted to grab him, he raised his hands abruptly to signal that he did not want to be touched; Lepore grabbed him again; he did not resist, but Lepore threw him to the ground, failing to execute the takedown maneuver properly. As the Court of Appeals for the Second Circuit has explained, it is "clearly established in this Circuit that it is a Fourth Amendment violation for a police officer to use significant force against an arrestee who is no longer resisting and poses no threat to the safety of officers or others." Jones v. Treubig, 963 F.3d 214, 225 (2d Cir. 2020); see also Lennox, 968 F.3d at 157 ("On July 22, 2016, it was therefore clearly established by our Circuit caselaw that it is impermissible to use significant force against a restrained arrestee who is not actively resisting."). "[T]his is true despite differences in the precise method by which th[e] force is conveyed." Lennox, 968 F.3d at 157. Because a reasonable jury could conclude that Lepore used significant force and that Muhammad was neither threatening nor resisting at the time Lepore deployed that force, Lepore has failed to establish that he is entitled to qualified immunity as a matter of law on this record.

*     *     *

Muhammad has identified genuine factual disputes regarding the threat he posed to Lepore and others and the amount of resistance, if any, he offered at the time Lepore threw him to the ground. And these factual disputes, if resolved in Muhammad's favor, would both establish a Fourth Amendment violation and preclude Lepore from invoking qualified immunity. The

15

defendants' motion for summary judgment dismissing Muhammad's federal excessive-force claim against Lepore is therefore **denied.**

### B.

The defendants also move for summary judgment dismissing Muhammad's state-law claims for assault and battery against Lepore and the Port Authority.

"Except for § 1983's requirement that the tort be committed under color of state law, the essential elements of excessive force and state law assault and battery are substantially identical." Humphrey v. Landers, 344 F. App'x 686, 688 (2d Cir. 2009) (summary order) (quoting Posr v. Doherty, 944 F.2d 91, 94–95 (2d Cir. 1991)). Lepore is not entitled to summary judgment on Muhammad's state-law assault claim for the same reason he is not entitled to summary judgment on Muhammad's Fourth Amendment claim: there are genuine disputes of material fact regarding the reasonableness of Lepore's use of force.

Unlike with his Fourth Amendment claim, Muhammad also brings his state-law assault-and-battery claim against the Port Authority, which he argues is vicariously liable for Lepore's conduct. The defendants do not meaningfully dispute that Lepore was acting within the scope of his employment when he threw Muhammad to the ground. Therefore, the defendants' motion for summary judgment dismissing Muhammad's state-law claim against the Port Authority also fails. That would be true regardless of Lepore's

16

entitlement to qualified immunity because "a municipal employer is vicariously liable for the wrongs of its employee, even when the employee is individually immune, so long as the wrong was committed within the scope of employment." Triolo v. Nassau Cnty., 24 F.4th 98, 110 (2d Cir. 2022) (holding that Nassau County was vicariously liable for state-law claims arising out of the conduct of an employee who was entitled to individual immunity); see also id. at 110 n.8 (concluding that Monell's municipal-custom-or-policy rule does not apply when "a municipal employer [is] held vicariously liable for its employee's wrongs under New York law").

The defendants argue that Muhammad cannot pursue a claim for assault and battery under New York law because that claim would duplicate his Fourth Amendment claim. But the defendants are mistaken. A plaintiff ordinarily cannot recover multiple times for the same injury, but can pursue overlapping claims. Indeed, "it is well-established that a plaintiff may pursue a Fourth Amendment excessive force claim and state law assault and battery claims in the same action." Quezada v. City of Waterbury, 2023 WL 5096144, at *5 (D. Conn. Aug. 9, 2023); see also Sabino v. Port Auth. Police Dep't, 2024 WL 3728974, at *5 (S.D.N.Y. Aug. 7, 2024) ("However, this Court has allowed plaintiffs to bring claims for both state law assault and battery and excessive force under Section 1983 in the same action.").

The defendants' motion for summary judgment dismissing Muhammad's state-law assault-and-battery claims against Lepore and the Port Authority is therefore **denied**.

## C.

Finally, the defendants move for summary judgment dismissing Muhammad's "claim for punitive damages." Reply 10. As an initial matter, "[i]t is well established in New York law that punitive damages are a remedy and not a separate cause of action." Tears v. Boston Sci. Corp., 344 F. Supp. 3d 500, 517 (S.D.N.Y. 2018). Punitive damages, moreover, are generally available for assault and battery under New York law and excessive force under the Fourth Amendment. See Doe v. Olive Leaves, Inc., 2024 WL 3048373, at *12 (E.D.N.Y. Feb. 16, 2024) ("Punitive damages are also recoverable in an action for assault and battery under New York law"); Jackson v. Tellado, 2018 WL 4043150, at *9 (E.D.N.Y. Aug. 24, 2018) ("[N]umerous cases from this Circuit have determined that punitive damages awards are appropriate for excessive force claims.") (collecting cases).

The defendants contend that Muhammad's request for punitive damages is nevertheless legally insufficient because he "did not allege punitive damages against Officer Lepore in his individual capacity but rather as an employee of the Port Authority." Reply 10. But it is not clear what more the defendants believe Muhammad must allege. His complaint contends that Lepore acted unlawfully while working as a law-enforcement official for the Port Authority, and that he seeks punitive damages. Alterman Decl., Ex. B ("Corrected Complaint") ¶¶ 45–48, ECF No. 39-2. The defendants cite no case that a plaintiff cannot recover punitive damages from a state or municipal law-enforcement officer when that law-enforcement officer is acting within the scope of his

18

employment. The Court cannot conclude that Muhammad is unable to recover punitive damages from Lepore as a matter of law. The defendants' motion for summary judgment dismissing Muhammad's request for punitive damages with respect to Lepore is therefore **denied.**

The Port Authority, by contrast, cannot be held liable for punitive damages. "Although the Court of Appeals for the Second Circuit has not addressed the question, other courts in this district have applied to the Port Authority the Supreme Court's reasoning in City of Newport v. Fact Concerts, Inc. that municipalities should not be subject to punitive damages." Holden v. Port Auth. of N.Y. & N.J., 521 F. Supp. 3d 415, 437 (S.D.N.Y. 2021). "The combination of the Port Authority's liability for compensatory damages and individual officer liability for both compensatory and punitive damages should be sufficient to satisfy the goal of deterrence." Id. Accordingly, "the Port Authority … is immune from punitive damages." Id.; see also Kosmidis v. Port Auth. of N.Y. & N.J., No. 18-cv-8413, 2021 WL 4442812, at *6 (S.D.N.Y. Sep. 28, 2021) (granting summary judgment dismissing request for punitive damages on the plaintiff's federal excessive-force and state assault-and-battery claims because "punitive damages cannot be assessed against the Port Authority"); Evans v. Port Auth. of N.Y. & N.J., 273 F.3d 346, 357 (3d Cir. 2001) (same).

## CONCLUSION

The Court has considered all the arguments raised by the parties. If any argument was not specifically addressed, it is either moot or without merit. For the foregoing reasons, the defendants' motion for summary judgment dismissing Muhammad's claims for excessive force under the Fourth Amendment and for assault and battery under New York law against Lepore is **denied**. The motion for summary judgment dismissing Muhammad's assault-and-battery claim against the Port Authority is **denied.** The defendants' motion for summary judgment dismissing Muhammad's request for punitive damages for the federal excessive-force claim and the state assault-and-battery claim against Lepore is **denied**. The motion is otherwise **granted**.

The Clerk is respectfully directed to close ECF Nos. 38 and 50.

**SO ORDERED.**

Dated:     **New York, New York**
           **May 15, 2026**

                              _____
                                 **John G. Koeltl**
                              **United States District Judge**

20